UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

| | |
|---|---|
| JOHN PARKER and RICARDO HANSON, | **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| Plaintiff, | |
| -v- | **13-CV-3891 (AT)** |
| THE CITY OF NEW YORK, NYPD Officer JEREMIAH TORRES (in his individual capacity), NYPD Officer YUSHIRA ROSARIO (in her individual capacity), | ECF Case |
| Defendants. | |

-----------------------------------------------------------------x

Plaintiffs JOHN PARKER and RICARDO HANSON, through their attorney ROBERT

M. QUACKENBUSH of Rankin & Taylor, PLLC, as and for the first amended complaint in this

action, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiffs' rights under the First, Fourth, and
   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights
   Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiffs JOHN PARKER and RICARDO HANSON's rights to be free from unreasonable
   searches and seizures were violated when an officer of the New York City Police Department
   ("NYPD") – defendant JEREMIAH TORRES – unlawfully arrested Mr. PARKER for
   "refusing to sit down and relax" while other police officers arrested one of Mr. PARKER's
   acquaintances. Notwithstanding the fact that Officer TORRES' sworn allegation that Mr.
   PARKER "refus[ed] to sit down and relax" is completely untrue, it does not constitute a
   violation of any law even if it *were* true.

3. Officer TORRES then returned to the scene of Mr. PARKER's arrest and, along with Officer YUSHIRA ROSARIO, arrested RICARDO HANSON in apparent retaliation for "asking too many questions" about Mr. PARKER's arrest.

4. By arresting both Mr. PARKER and Mr. HANSON without probable cause to believe either had violated any law, Officer TORRES and Officer ROSARIO violated their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

5. Accordingly, Mr. PARKER and Mr. HANSON each seek an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth and Fourteenth Amendments to the United States Constitution.

7. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. PARKER's claims and Mr. HANSON's claims arose in Manhattan's Central Park, within the confines of this judicial district.

8. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

9. Plaintiff JOHN PARKER is, and was at all times relevant to this action, a resident of the County and State of New York.

10. Plaintiff RICARDO HANSON is, and was at all times relevant to this action, a resident of the County and State of New York.

11. At the time of the incident described below, both Mr. PARKER and Mr. HANSON were employed as lifeguards with the New York City Parks Department, assigned to Lasker Pool in Central Park.

12. Both Mr. PARKER and Mr. HANSON are still employed by the Parks Department in that capacity.

13. Mr. PARKER is also currently enrolled as a student at Hunter College.

14. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

15. Defendant NYPD Officer JEREMIAH TORRES is and was at all times relevant herein an officer, employee and agent of the NYPD, who was and is assigned to the NYPD's Central Park Precinct.

16. Officer TORRES is being sued herein in his individual capacity.

17. Defendant NYPD Officer YUSHIRA ROSARIO is and was at all times relevant herein an officer, employee and agent of the NYPD, who was and is assigned to the NYPD's Central Park Precinct.

18. Officer ROSARIO is being sued herein in her individual capacity.

19. At all times relevant herein, both Officer TORRES and Officer ROSARIO were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental

to the performance of their lawful functions in the course of their respective duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of his duties in the capacity.

20. Both Officer TORRES' acts and Officer ROSARIO's acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Mr. PARKER's rights and Mr. HANSON's rights

## STATEMENT OF FACTS

21. Between approximately 6:15 p.m. and 6:30 p.m. on August 1, 2011, Mr. PARKER and Mr. HANSON finished working their shifts as lifeguards in Central Park's Lasker Pool.

22. Mr. PARKER and Mr. HANSON made plans to meet up with other co-workers after work. Accordingly, Mr. PARKER and the other lifeguard walked around the pool area in an effort to find their co-workers. After a short search, Mr. PARKER found the others.

23. Shortly after Mr. PARKER and Mr. HANSON met up with the other off-duty lifeguards, a female police officer approached the group and stated that she saw one of the other lifeguards (not Mr. PARKER and not Mr. HANSON) with marijuana.

24. As the officer spoke with certain members of the group (not Mr. PARKER and not Mr. HANSON), several other officers – including Officer TORRES – arrived in the area.

25. Even though Mr. PARKER had not engaged the investigating officer or the marijuana suspect in any conversation during the investigation, and even though Mr. PARKER was obviously not interfering with the officer's investigation into the alleged marijuana possession, Officer TORRES began barking orders at Mr. PARKER to move and to sit down.

26. Mr. PARKER verbally protested Officer TORRES' order, and the two engaged in a discussion about the propriety of Officer TORRES' conduct – which included words by Mr. PARKER that were critical of Officer TORRES' job performance.

27. In an apparent effort to diffuse the situation, another female officer (perhaps a supervisor) approached Mr. PARKER and Officer TORRES and asked Mr. PARKER to move to a position about 10 to 15 feet *even further* away. Because he did not want or invite the confrontation, Mr. PARKER complied with the officer's request and stepped even further away from the investigation – making him about 25 to 30 feet from the marijuana investigation. After moving further away, Mr. PARKER then sat down on an elevated concrete planter and observed the investigation continue to unfold.

28. Even though Mr. PARKER had stopped talking with Officer TORRES and even though he was substantially far away from the investigation, Officer TORRES again approached Mr. PARKER and demanded that Mr. PARKER produce his identification.

29. In order to avoid conflict, Mr. PARKER complied and gave his state-issued identification card to Officer TORRES.

30. Officer TORRES then asked Mr. PARKER how old he was, and Mr. PARKER replied that his correct birthdate was on his identification – which was in Officer TORRES' hand.

31. In an apparent attempt to provoke Mr. PARKER, Officer TORRES again asked Mr. PARKER how old he was. In response, Mr. PARKER ignored the question and remained silent.

32. After a short time passed without Mr. PARKER answering the question, Officer TORRES ordered Mr. PARKER to stand up and turn around.

33. Mr. PARKER complied, and Officer TORRES rear-cuffed him and placed him under arrest.

34. Officer TORRES escorted Mr. PARKER to a nearby police vehicle and placed him inside.

35. Officer TORRES then returned to the scene of the arrest and investigation.

36. After witnessing Officer TORRES arrest Mr. PARKER, Mr. HANSON and at least one other off-duty lifeguard began to ask questions about the arrest – which they believed to be unjust.

37. In response to the questions, Officer TORRES stated, in sum and substance, "YOU GUYS ARE ASKING TOO MANY QUESTIONS. WE'RE GOING TO SORT THIS OUT AT THE STATION."

38. Officer ROSARIO witnessed the entire interaction, but – despite knowing there was no basis to make additional arrests – she nevertheless went along with Officer TORRES' suggestion and placed Mr. HANSON  under arrest.

39. Both Mr. PARKER and Mr. HANSON (along with at least one other off-duty lifeguard who was not the subject of the initial marijuana investigation) were thereafter taken to the NYPD's Central Park Precinct, where they were detained for several hours.

40. Mr. PARKER was detained in a cell, while Mr. HANSON was detained in a room of some kind.

41. Sometime around 9:00 p.m., Officer TORRES brought Mr. PARKER into a room inside the precinct. There, Officer TORRES issued a criminal court summons to Mr. PARKER which, amazingly, charged him with a violation of N.Y. Pen. L. § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic.

42. In handing the summons to Mr. PARKER, Officer TORRES stated that he wanted "to teach [Mr. PARKER] a lesson." Officer TORRES did not describe the nature of the "lesson" he intended to "teach" to Mr. PARKER, and Mr. PARKER did not ask Officer TORRES to elaborate.

43. Likewise, Officer ROSARIO issued Mr. HANSON a criminal court summons which, equally amazingly, charged him with a violation of N.Y. Pen. L. § 240.20(2), disorderly conduct by making unreasonable noise.

44. Around 9:30 p.m., both Mr. PARKER and Mr. HANSON were released from custody.

45. The actions of both Officer TORRES and Officer ROSARIO were in contravention of the consent decree entered into by the NYPD in Black v. Codd, 73-CV-5283 (S.D.N.Y., June 1, 1977).

46. This consent decree was incorporated into the New York Police Department Patrol Guide in 1990, setting forth the NYPD's recognition of this rule explicitly recognizing the rights of onlookers to police actions to observe police action in progress and to ask police officers questions.

47. The consent decree in Black v. Codd, which is attached hereto as Exhibit 1, states: "It is the policy of the New York City Police Department… that when a person (or persons) is detained, stopped or arrested in public areas[,] a person or persons not involved in the conduct for which the first person is stopped or arrested may remain in the vicinity of the stop or arrest as an onlooker or onlookers, subject to the safety of the person stopped, the third persons, the general public, and officer of the police department, and to provisions of the law…"

48. In support of the disorderly conduct charge against Mr. PARKER, Officer TORRES swore to the following on the back of the criminal court summons:

> [At the time and place of the occurrence], def (*sic*) was refusing to sit down and relax while police investigation was being conducted causing an interference with investigation. Also refused to give age and address.

49. In addition to those allegations having nothing to say about Mr. PARKER allegedly blocking vehicular or pedestrian traffic, they are also materially false.

50. For instance, Mr. PARKER *was* seated when Officer TORRES requested his identification.

51. Moreover, the allegation that Mr. PARKER "refused to give age and address" is belied by the front of the summons on which Officer TORRES wrote Mr. PARKER's correct age and address – which plaintiff *did* supply by handing his identification to Officer TORRES. In any event, refusal to speak with a police officer is obviously not a crime, and no reasonably competent officer would think that it is.

52. In support of the disorderly conduct charge against Mr. HANSON, Officer ROSARIO swore to the following on the back of the criminal court summons:

> [At the time and place of the occurrence], the deft. (*sic*) was observed causing a public inconvenience, annoyance, creating a risk there of (*sic*) in a public place by acting in a loud manner and unreasonable noise (*sic*).

53. In addition to those allegations being entirely conclusory and doing nothing except reciting the elements of the statute – devoid of any factual allegations at all – they are also materially false.

54. No one except the police and the off-duty lifeguards were anywhere near the scene of the investigation and arrests – there was no "public inconvenience. Moreover, no reasonably competent officer could conclude Mr. HANSON was created unreasonable noise by questioning the officers about the arrest of Mr. PARKER.

55. Upon review of the allegations of both criminal court summonses, the Honorable Abraham Clott dismissed the charges as facially insufficient about two weeks in advance of Mr. PARKER's and Mr. HANSON's respective court dates, without even needing the benefit of

Mr. PARKER's appearance, Mr. HANSON's appearance, or any argument from a defense attorney.

56. As a result of defendants' actions, Mr. PARKER and Mr. HANSON were both deprived of their liberty for several hours, were humiliated, and endured emotional distress.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF RIGHTS**
**FIRST, FOURTH & FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**
***(By Mr. PARKER Against Officer TORRES and by Mr. HANSON Against Officer TORRES and Officer ROSARIO)***

57. Mr. PARKER and Mr. HANSON incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

58. By the acts described above, including but not limited to Officer TORRES (i) arresting Mr. PARKER for "refusing to sit down and relax" when, in fact, he was seated, relaxed and cooperative and (ii) issuing the criminal court summons to Mr. PARKER "to teach [him] a lesson" and in obvious retaliation for observing police conduct and asking questions about it, Officer TORRES, under color of state law, deprived Mr. PARKER of his rights, privileges and immunities secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, including without limitation deprivation of the following constitutional rights:

    a.   freedom from unreasonable searches and seizures of his person, under the Fourth and Fourteenth Amendments,

    b.   freedom from arrest without probable cause, under the Fourth and Fourteenth Amendments,

    c.   freedom from false imprisonment, under the Fourth and Fourteenth Amendments, and

    d.   freedom from retaliatory arrest, under the First and Fourteenth Amendments.

59. Officer TORRES' deprivation of Mr. PARKER's constitutional rights resulted in the injuries and damages set forth above.

60. By the acts described above, including but not limited to Officer TORRES and Officer ROSARIO (i) arresting Mr. HANSON for making unreasonable noise when, in fact, he was merely making verbal inquiries and (ii) issuing the criminal court summons to Mr. HANSON because he was asking "too many questions" about the officers' official conduct, Officer TORRES and Officer ROSARIO, under color of state law, deprived Mr. HANSON of his rights, privileges and immunities secured by the First, Fourth and Fourteenth Amendments to the United States Constitution, including without limitation deprivation of the following constitutional rights:

    a. freedom from unreasonable searches and seizures of his person, under the Fourth and Fourteenth Amendments,

    b. freedom from arrest without probable cause, under the Fourth and Fourteenth Amendments,

    c. freedom from false imprisonment, under the Fourth and Fourteenth Amendments, and

    d. freedom from retaliatory arrest, under the First and Fourteenth Amendments.

61. Officer TORRES' and Officer ROSARIO's deprivation of Mr. HANSON's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM FOR RELIEF**
**DEPRIVATION OF RIGHTS**
**FIRST, FOURTH & FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**
(*By Mr. PARKER and Mr. HANSON Against THE CITY OF NEW YORK*)

62. Mr. PARKER and Mr. HANSON incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

63. The acts and omissions of Officer TORRES and Officer ROSARIO (referred to collectively as "individual defendants") described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence on August 1, 2011 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

64. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

65. The acts complained of were carried out by the individual defendants in their capacities as a police officer pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

66. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include but are not limited to the following unconstitutional practices:

   a. Detaining, arrests and manufacturing evidence against individuals who were arrested while observing arrests taking place in public, in violation of the consent decree Black v. Codd, 73-CV-5283 (JNC) (S.D.N.Y., June 1, 1977);

   b. Detaining, arrests and manufacturing evidence against individuals who are openly critical of police officers in public;

   c. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i. in order to protect other officers; and/or

       ii. in order to chill or obstruct persons from lawfully observing arrests of persons in public;

   d. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct; and

   e. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers.

67. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

    a.  Pedine v. City of New York, 13-CV-1675 (CM) (SN) (S.D.N.Y.) (young professional arrested in retaliation for commenting to her friends, in the presence of two police officer, that "[she] wish[ed] they would stop 'stop-and-frisk'"; plaintiff detained for an hour and issued a criminal court summons which contained perjurious statements about plaintiff blocking vehicular traffic at the time of the incident);

    b.  Bell v. City of New York, 12-CV-5357 (PAC) (S.D.N.Y.) (police officer arrests man who signaled the middle finger to him on a nearly-deserted sidewalk in the middle of the night; plaintiff detained and issued a criminal court summons which contained perjurious allegations that the sidewalk was crowded with pedestrians who became alarmed and annoyed and that plaintiff told the officers, in front of the crowd, that he hated police);

    c.  People v. Alicea, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement… To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

    d.  People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

e. <u>Schoolcraft v. City of New York</u>, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

f. <u>Lotorto v. City of New York</u>, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

g. <u>Long v. City of New York</u>, 09-CV-6099 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, <u>to wit</u>, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

h. <u>Taylor-Mickens v. City of New York</u>, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

i. <u>Lin v. City of New York</u>, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[1]

j. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

---

[1]     For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

k. <u>Williams v. City of New York</u>, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

l. <u>Dunlop v. City of New York</u>, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

m. <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

n. <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

o. <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

p. <u>Dotson v. City of New York</u>, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

q. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

r. <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

s. <u>Carin v. City of New York</u>, 95-CV-3472 (JFK), 1998 U.S. Dist. LEXIS 1533 (S.D.N.Y.) (bystander arrested while observing the arrest of a street vendor in a public place); and

t. <u>Kaufman v. City of New York</u>, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

68. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[2]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[3]

d. Regarding the CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[4] When it does, however, Police Commissioner Kelly controls whether

---

[2]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[3]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[4]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated

the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[5] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[6]

69. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

    a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[7]
>
> […]

---

complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[5]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[6]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[7]    Mollen Commission Report, p. 36.

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[8]

b.   In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[9]

c.   In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[10] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the

---

[8]      Mollen Commission Report, pp. 40-41.

[9]      Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[10]      Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[11]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[12]

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.

Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

---

[11]      *Id.*

[12]      John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[13]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[14]

f.   In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[15] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[16]

g.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations

---

[13]   Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[14]   John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[15]   In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[16]   *Id.*

reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[17]

70. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, *inter alia*, by the following:

   a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

   b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

   c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

71. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

72. The actions of the individual defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of retaliating against persons observing arrests in public and thereafter engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all:

---

[17]      David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

(i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

73. All of the foregoing acts by the defendants deprived both Mr. PARKER and Mr. HANSON of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "58" through "60" above.

74. The CITY knew or should have known that the acts alleged herein would both Mr. PARKER and Mr. HANSON of their rights guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution.

75. The CITY is directly liable and responsible for the acts of the individual defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

76. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or

customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

77. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein.

78. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, both Officer TORRES and Officer HANSON felt empowered to arrest both Mr. PARKER and Mr. HANSON in retaliation for observing a police investigation and making verbal challenges to the officers' conduct, arrests which were without probable cause.

79. Moreover, pursuant to the aforementioned CITY policies, practices and/or customs, both Officer TORRES and Officer HANSON felt empowered fabricate and swear to a false story to cover up their blatant violations of Mr. PARKER's and Mr. HANSON's constitutional rights.

80. The injuries to both Mr. PARKER and Mr. HANSON were a direct and proximate result of the CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers.

81. Upon information and belief, *but for* the CITY's apparent failure to train Officer TORRES and Officer ROSARIO concerning the lawful scope of their authority, neither Mr. PARKER nor Mr. HANSON would have been arrested and charged with disorderly conduct.

82. The CITY's acts and omissions detailed herein resulted in the injuries and damages set forth above.

## JURY DEMAND

83. Both Mr. PARKER and Mr. HANSON demand a trial by jury in this action on each and every one of their damage claims.

   ***WHEREFORE***, Mr. PARKER and Mr. HANSON demand judgment against the defendants individually and jointly and pray for relief as follows:

   a.   That they each be compensated for violation of their constitutional rights, pain, and suffering;

   b.   That Mr. PARKER be awarded punitive damages against Officer TORRES;

   c.   That Mr. HANSON be award punitive damages against both Officer TORRES and Officer ROSARIO;

   d.   That both Mr. PARKER and Mr. HANSON be compensated for attorneys' fees and the costs and disbursements of this action; and

   e.   For such other further and different relief as to the Court may seem just and proper.

///

///

///

///

///

///

Dated:         New York, New York
               October 1, 2013

                                                     Respectfully submitted,

                                                     /s/

By:    _____

                                                     Robert M. Quackenbush
                                                     Rankin & Taylor, PLLC
                                                     *Attorneys for the Plaintiffs*
                                                     11 Park Place, Suite 914
                                                     New York, New York 10007
                                                     t: 212-226-4507
                                                     f: 212-658-9480
                                                     e: robert@drmtlaw.com

# **<u>EXHIBIT 1</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

RICHARD BLACK; ALAN SALISBURY; WILLIE HAMILTON; :
EDWARD S. RICKARDS, J.R., and JAMES GANOCY; for
themselves and all others similarly situated,       :

                      Plaintiffs,                :

        -against-                                        :73 Civ. 5283
                                        (JMC)
MICHAEL CODD,  individually and as Police
Commissioner of the City of New York; Patrolman       :
PAUL A. BERT; Patrolman ROBERT CRUZ; Lieutenant :       STIPULATION
DANIEL DILLON; NEW YORK CITY POLICE DEPARTMENT;         AND ORDER
CITY OF NEW YORK,                                     :

                    Defendants.                :

-----------------------------------------------------x

        It is stipulated by and between the attorneys for the
parties herein that it is the policy  of the New York City Police
Department and the defendants that when a person (or persons)
is detained, stopped or arrested in public areas, a person or
persons not involved in the conduct for which the first person
is stopped or arrested may remain in the vicinity of the stop
or arrest as an onlooker or onlookers, subject to the safety of
the person stopped, the third persons, the general public, and
officers of the Police Department, and to provisions of law e.g.
P.L. §195.05.  The provisions of this order are intended solely
as a settlement of the above entitled litigation, and do not
constitute an admission that the above policy has been violated
by defendants, or any of them.  In the following provisions, the
term "officer" refers to New York City police officers, agents
of the defendants.

        1.  A person remaining in the vicinity of a stop
           or arrest (herein after an "onlooker") shall
           not be subject to arrest for violation of Penal
           Law §195.05 unless the officer has probable cause
           to believe a violation of Section 195.05 exists.

2.  None of the following constitutes probable cause for arrest or detention of an onlooker unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated:

    (a)  Speech alone, even though crude and vulgar;

    (b)  Requesting and making notes of shield numbers or names of officers;

    (c)  Taking photographs;

    (d)  Remaining in the vicinity of the stop or arrest.

3.  Whenever an onlooker is arrested or taken into custody, the arresting officer shall report the action to the supervisor at the station house or other place where the person is taken.  Section 110-2 and 110-7 of the Patrol Guide of the New York City Police Department (copies attached), shall be complied with.

4.  Defendants shall notify all officers and other employees of the Police Department of the terms of this stipulation by appropriate department order within 60 days of the entry of this order.  Such order shall embody the terms of paragraphs 1 through 3 of this order.  Area commanders will be informed that the basis for the said departmental order is the settlement of this litigation and that the terms of this order are part of the departmental order.  Area commanders shall inform precinct commanders of the existence of this order.

2

5. Costs, disbursements and attorneys' fees are waived by all parties and their attorneys.

The above provisions of this order shall and the same hereby do constitute the final judgment of this court upon the controversy between defendants, plaintiffs and the plaintiff class. In all other respects, the claims of the plaintiffs are dismissed with prejudice.


Dated: New York, New York
       6/1        1977


_Paul G. Chevigny_
PAUL G. CHEVIGNY
ALAN H. LEVINE
Attorneys for Plaintiffs

W. BERNARD RICHLAND
By:/s/ Robert Deutsch
   AS CORPORATION COUNSEL
   Attorney for Defendants



SO ORDERED: 6/1/77

/s/ John M Cannella
U.S.D.J.